STATE et al. v. FRANCO–AMERICAN SECURITIES, Limited, et al.

No. 11288.

Court of Civil Appeals of Texas. Galveston.

April 1, 1943.

Rehearing Denied June 24, 1943.

Turner, Rodgers & Winn, Carlton R. Winn, and George S. Terry, all of Dallas, and Black, Graves & Stayton, and Charles L. Black, all of Austin (Donald Campbell and L. A. Thompson, both of Tulsa, Okl., of counsel), for Stanolind Oil & Gas Co. (appellant and appellee)—Tracts 1–6.

Geo. E. B. Peddy, R. E. Seagler, and Tarlton Morrow, all of Houston (E. E. Townes and Vinson, Elkins, Weems & Francis, all of Houston, of counsel), for Geo. E. B. Peddy et al. (appellants and appellees)—Tracts 1–6.

A. D. Dyess, of Houston, for George H. Gay et al. (appellants)—Tract 5.

Gerald C. Mann, Atty. Gen., and James Noel, Asst. Atty. Gen., for the State of Texas (appellant)—Tract 1.

Dan Moody and H. Grady Chandler, both of Austin, and Weaver Moore, Fred L. Williams, and Jesse J. Lee, all of Houston (Moore & Moore and Williams, Lee, Kennerly & Cameron, all of Houston, of counsel), for Taylor J. Hughes and John C. Randolph (appellants)—Tract 1.

S. J. Brooks, Clinton G. Brown, Sr., W. F. Nowlin, and W. L. Matthews, all of San Antonio (Brooks, Napier, Brown & Matthews, of San Antonio, of counsel), for Homer Browne, A. L. Ballard, and James A. Harley (appellees)—Tracts 3 and 4.

J. R. Hill, of Houston, adopts Browne et al. brief as to tract 4 for Dorothy J. Hill (appellee).

Gerald C. Mann, Atty. Gen., and James Noel, Glenn R. Lewis, and Fagan Dickson, Asst. Attys. Gen., for the State of Texas (appellee)—Tract 6.

W. T. Williams, Sr., of Austin, McDonald Meachum, of Houston, and Locke, Locke, Dyer & Purnell, Eugene P. Locke, and McGillivray Muse, all of Dallas, for W. T. Williams, Sr. (appellee)—Tract 6.

Edward S. Boyles and Bruce Billingsley, both of Houston, for Ruthe Blount Hunt (appellant), adopts Peddy brief, Tracts 3 and 4.

Kayser, Liddell, Benbow & Austin, Cook, Blake & McCormick, and Cecil N. Cook, all of Houston, for C. I. McLean and National Bank of Commerce of Houston (appellants), adopt Stanolind brief and Peddy brief, Tracts 3 and 4.

Floyd Enlow, of Angleton for Mrs. Belia Matsushita, R. J. Schmidt et ux. (appellants), adopts Stanolind brief, Tract 6.

E. B. Adams, of Hot Springs, for Frances C. Rasmussen et vir. (appellants), adopts Stanolind brief, Tract 6.

Lewis Fogle, of Houston, for R. J. St. Germain (appellee), adopts Stanolind brief, Tract 1.

Richard B. Shults, of Dallas, for royalty owners (appellees), adopts Stanolind brief.

John T. Maginnis and Baker, Botts, Andrews & Wharton, all of Houston, for Charles A. Miller et al. (appellees), adopt Stanolind brief, Tracts 1 and 2.

John T. Maginnis and Baker, Botts, Andrews & Wharton, all of Houston, for David Whittiker and Raymond Neilson (appellees), adopt Stanolind brief, Tract 5.

Lewis H. Follett, of Angleton, for Lewis H. Follett (appellee), adopts Stanolind brief, Tract 1.

Fall & Hrdlicka and C. R. Hrdlicka, all of Houston, for Snoot Company (appellant and appellee), adopts Stanolind brief, Tracts 3 and 4.

Walker F. Johnston, of Houston, for Mabel K. Caldwell (appellant), adopts Stanolind brief, Tract 6.

E. B. Colgin, of Houston, for Steve C. Paul (appellee), adopts reply brief of Stanolind, Tract 1.

Hunt & Lawler, of Houston, for Houston Royalty Co. (appellee), adopts reply brief of Humble, Stanolind, Rotex, Interstate and Sides, Tract 5.

E. B. Simmons, of San Antonio, for Emil and Matilda Grote (appellees), Tract 1.

Albert J. DeLange and W. Noble Carl, both of Houston and Maco Stewart, of Galveston, for J. W. Coker et al. (appellees), adopt briefs.

Albert J. DeLange and Harry B. Sims, both of Houston, for Rosa Ryan Fetherston et al. (appellants), adopt briefs.

W. E. Greer, Donald M. Markle, and James W. Wayman, all of Galveston, for Richard Haden (appellee), adopt Stanolind brief.

PER CURIAM.

This suit was brought by the State of Texas and numerous parties claiming mineral rights under it, in regular form of trespass to try title, to recover from a large number of defendants, corporate and individual, six tracts of land alleged to be vacancies in the public domain of Texas, lying within what is now termed the Hastings Oil Field, which is located partly in both Galveston and Brazoria Counties. Numerous additional parties were brought into the cause by the State's amended pleadings and by voluntary interventions.

The consecutively-numbered tracts, 1 to 6, both inclusive, declared upon as constituting the vacancies, were described in the State's petitions by metes and bounds. The following map shows what we deem to be

the true location of each of the alleged vacancies and their relation to the surrounding surveys and the Galveston-Brazoria County line as monumented in 1896:

2-A

PLAT NO. 1. (SEE DEFENDANTS' EXH.#271, MAP VOL.1, PG. 51)

As described in the State's petitions, Tracts 1 and 6 adjoin. They are 247 varas wide and lie between the H. T. & B. Block on the west and the A. C. H. & B. and Hennell Stevens Surveys on the east; Tracts 3 and 4 lie between the A. C. H. & B. Surveys and the county line; Tract 5 is between the Masterson, Hoppel, and Henry Surveys. Tract 2 is south of the A. C. H. & B. Survey 2, east of Tract 1, and east and north of parts of the Hennell Stevens.

The various defendants, intervenors, cross-actors, leaseholders, and others set up extended pleadings in their several responses, or asserted their interests in the premises on their own pleadings, some adopting the State's contentions wholly or partly and claiming certain interests under or with it; so that structural issues of law were thus joined between the advocates of the validity of the alleged vacancies, on the one hand, and those denying their existence, on the other, as well as certain inter-party subsidiary and contingent ones.

The trial court submitted to a jury the following fifteen issues of fact, the answers to which are added:

"No. 1: Do you find from a preponderance of the evidence that the surveyor Hennell Stevens in his original survey of A. C. H. & B. Surveys Nos. 1 and 2 placed the east boundary line of A. C. H. & B. Surveys Nos. 1 and 2 on and with the Galveston-Brazoria County line as now monumented?" Answer: "Yes".

"No. 2: Do you find, from a preponderance of the evidence, that the surveyor Hennell Stevens in locating A. C. H. & B. Surveys Nos. 1 and 2 in 1875 placed the west line of said surveys 2121 varas west from a point in the now monumented Galveston-Brazoria County line which is 543 varas southward from the southernmost point of intersection of said county line with the B. B. B. & C. Survey?" Answer: "Yes".

"No. 3: Do you find from a preponderance of the evidence that the surveyor Hennell Stevens placed the west line of A. C. H. & B. Survey Nos. 1 and 2 in the east line of the H. T. & B. R. R. Co. Block of surveys, as such east line is located on the ground?" Answer: "No".

"No. 4: Where do you find, from a preponderance of the evidence, that the John R. Williams League north corner was located by the surveyor Cook in 1824 on a course north 45 degrees east from the point on the northernmost crossing of Clear Creek by the Williams' northwest line? Answer by giving distance in varas." Answer: "800 varas".

"No. 5: Do you find, from a preponderance of the evidence, that the surveyor Samuel P. Browne blazed the 'M' tree in 1848?" Answer: "Yes".

"No. 6: Do you find, from a preponderance of the evidence, that the 'M' tree was blazed by Samuel P. Browne, if it was blazed by Browne, on Browne's southwest line of the Jackson Survey and the northeast line of the H. T. & B. R. R. Co. Block" "Yes".

"No. 7: Do you find, from a preponderance of the evidence, that the west line of the B. T. Masterson Survey was placed in the Galveston-Brazoria County line as now monumented by the Surveyor A. Hoxie in locating said survey in the year 1890?" Answer: "Yes".

"No. 8: (No answer).

"No. 9: Do you find, from a preponderance of the evidence, that the surveyor Robert B. Harris in his survey for the field notes of the Hennell Stevens Survey placed its southwest corner on the ground at a point north 80 degrees west 88 varas from the southwest corner of the ground location of the R. A. MaGee Survey?" Answer: "He did so place the corner on the ground".

"No. 10: Do you find, from a preponderance of the evidence, that the surveyor Robert B. Harris, at the time he wrote the field notes for the original Hennell Stevens Survey in 1889, then knew the location on the ground of the east lines of the H. T. & B. Ry. Sections Nos. 37 and 40?" Answer: "He did not know the ground location of said east lines."

"No. 11: Do you find, from a preponderance of the evidence, that the surveyor Robert B. Harris in 1889, at the time he surveyed and wrote the field notes for the Hennell Stevens Survey as originally patented, mistakenly called for the east line of the H. T. & B. R. R. Co. Sections 37 and 40 to run north and south through a point 88 varas north 80 degrees west from the southwest corner of the R. A. MaGee Survey, as said Magee Survey is located on the ground?" Answer: "He did".

"No. 12: Do you find, from a preponderance of the evidence, that the locating surveyor in locating the Hennell Stevens Survey in 1889 placed the west line of said survey in the east line of the H. T. & B. R. R. Co. block of surveys?" Answer: "No".

"No. 13: Do you find, from a preponderance of the evidence, that the B. T. Masterson Survey was surveyed on the ground by A. Hoxie, in the year 1890?" Answer: "Yes".

"No. 14: Do you find, from a preponderance of the evidence, that the south corner of the B. B. B. & C. Railway Survey, as surveyed by George W. Durant in 1860, is at the stake located at the Tison south fence corner?" Answer: "No".

"No. 15: Do you find, from a preponderance of the evidence, that the east corner of the B. T. Masterson Survey was located by A. Hoxie in 1890 at a point North 43 deg. 33' east 900.62 varas from the point of intersection of the Wm. Henry northwest line with the Galveston-Brazoria county line as now monumented?" Answer: "No".

On December 30, 1940, the court rendered its final judgment partly on, partly notwithstanding, and partly discarding certain findings in the verdict so returned. The gist of such judgment was that:

Tracts Nos. 1, 2, and 5 were found to constitute no vacancies. Tracts Nos. 3, 4, and 6 were held to be vacancies substantially as declared by the State; and awards were accordingly made as between the parties held to be respectively entitled thereto.

The trial court, through peremptory instruction, held Tract No. 2 to be a part of the patented 266-acre Hennell Stevens Survey, and that part of its judgment has not been appealed from by any party, hence will remain undisturbed.

■ First among the controlling questions presented in the appeal is whether or not the location of the John R. Williams League was shown on the ground, and if so, where its position was with reference to the sites of the vacancies claimed to exist by the State and the mineral-claimants under it (See Chapter 271, Acts 42nd Legislature)—together with the resulting effect of such location upon those claims.

As indicated supra, by its submitted issue No. 4, the trial court initially regarded that inquiry as one of fact for the jury by asking it to find how far the north corner of the league was from the northernmost crossing of Clear Creek by its northwest line; but, on return of the answer to the issue fixing that distance at 800 varas, on motion from the parties adverse to the State, the court set that finding aside as being wholly without evidence to support it, and, as before stated, denied recovery of sued-for Tracts Nos. 1 and 2, upon a holding that the undisputed evidence established as a matter of law that the lines and corners of the Williams League had originally been located and still were on the ground in the positions claimed by such opposing litigants; that is, that such north corner was at a distance of only 336 varas northeast from the center of such crossing of Clear Creek on its northwest line, and that its east corner was at an old post and buggy-axle 1096.2 varas from the center of Clear Creek on the league's southeast line.

This court approves those two holdings of the court below, after a most painstaking examination of the record, including the voluminous statement of facts and maps, surveys, briefs, and arguments.

It would serve no useful purpose to here undertake a recapitulation of the evidence as to the location of the Williams Survey, since it seems that the conclusive if not undisputed facts support the trial court's action. Indeed, the opposing litigants offered no affirmative testimony looking to the location of the Williams League on the ground, one of their two surveyors dismissing the inquiry by saying that he did not know how to locate it, and the other by protesting that he had not found time to do so.

On the opposite side, the record teems with compelling evidence to the purport that there never had been, and was not on the date of this trial, any substantial doubt about the exact location of the whole of the John R. Williams League on the ground, which had been titled on July 29, 1824, after its lines had been run by the surveyor, John Cooke, it having been the oldest survey in that entire area; to it all the other adjoining and surrounding surveys, being junior ones, had been tied and were called to run with relation thereto. Among these junior adjoiners were the

John R. Dickinson League on the east and south, the Thomas Choate on the north, the Perry & Austin on the west, the B. B. B. & C. R. R. Co. and the Robert Hoppel on the southwest. The John R. Dickinson, the first of such junior adjoinders, was so tied onto the Williams within less than a month, on August 19 of 1824, after the Williams was located, whereas the Perry & Austin came next on May 26 of 1830, followed by the Thomas Choate on January 18 of 1832.

Not only so, but vast volumes of direct evidence upon this trial from many surveys made from the field notes of the John R. Williams located all of its corners and its lines in a conclusive and indisputable way. This consisted of the statements of, and field-notes and records made by, the many capable official surveyors who had run out the lines or located the corners, or both, of the Williams, almost from its title-date down to this trial; and, as indicated, there was no positive evidence of any sort to the contrary. The league occupied a northwest and southeast position on the ground, with Clear Creek meandering across it generally from west to east through its northern reaches, whereas Coward's Creek came across from the general neighborhood of its southwest area to a junction with Clear Creek to the north, about midway across the league from west to east; Chigoe Bayou also ran across its southeast corner. Thus were offered many natural objects from which its positions were at all times accurately ascertainable, and these—shown to have remained unchanged—tie it to the same unmistakable moorings from the time it was so titled up to and including this trial.

■ With the senior John R. Williams thus in fact located on the ground, consequent effect must be given to the field notes of its junior adjoining surveys, which are so tied to and dependent for place upon it; Freeman v. Mahoney, 57 Tex. 621; Moore v. Stewart, Tex.Sup., 7 S.W. 771; Taylor v. Higgins Oil & Fuel Co., Tex.Civ.App., 2 S.W.2d 288, infra; Steusoff v. Jackson, 40 Tex.Civ.App. 328, 89 S.W. 445; Kirby Lumber Co. v. Adams, 127 Tex. 376, 93 S. W.2d 382; Thurman v. Leach, Ky., 116 S. W. 300.

Upon these two predicates, to-wit, establishment of this fixed location of the Williams—pursuant to its own field notes—on the ground, and faithfully applying the settled law, as the last-cited authorities declare it, the junior surveys accordingly being given positions determined by their titled relationship to the senior one, the overall conclusion seems inescapable that all of the alleged vacancies so herein declared upon by the State, Nos. 1 to 6, inclusive, must be erased.

Not only was the Williams shown to have been in fact located on the ground adversely to the State's contentions, but the development of its history, together with the use and appropriation of its soil in such position throughout a period of more than 100 years, establish that position as a matter of law as well; indeed, in a successive line of litigations in the State and Federal courts of Texas, the facts of such ground-location were time and again implemented into the judgments of those several courts, in causes wherein such location on the ground of some determinative line, corner, or other position, of the John R. Williams League, was a necessary ingredient of the court's decision in the particular case; among such causes are these: Camp v. League, Tex.Civ.App., 92 S.W. 1062; Wolf v. Scott, Tex.Civ.App., 253 S.W. 905; Carlisle v. Butler, U. S. District Court, Southern District of Texas.[1] See also Taylor v. Higgins, Oil & Fuel Co., Tex.Civ.App., 2 S.W.2d 288; Hamilton v. Blackburn, 43 Tex.Civ.App. 153, 95 S.W. 1094; Thomson v. Langdon, 87 Tex. 254, 259, 28 S.W. 931; Petty v. Paggi Bros. Oil Co., Tex.Com.App., 254 S.W. 565; Porter v. State, Tex.Civ.App., 15 S.W.2d 191; Blaffer v. State, Tex.Civ.App., 31 S. W.2d 172; Bond v. Kirby Lumber Co., Tex.Civ.App., 47 S.W.2d 891; Federal Royalty Co. v. State, 128 Tex. 324, 98 S.W. 2d 993; Eppenauer v. Ohio Oil Co., 5 Cir., 98 F.2d 524; Conley v. Abrams, Tex.Civ. App., 7 S.W.2d 674.

■ None of these three first-cited decisions have ever been overturned, but, on the contrary, all have long since become final to the extent that, in accord with the ancient but still subsisting doctrine of stare decisis, their determined positions have become a part of the fabric of our jurisprudence, hence may no longer be disrupted or set at naught, as the State in this litigation undertook to do; especially so

---

[1] No opinion for publication.

when this record shows as a fact that, once the Williams is thus placed, every other survey in the area can be readily relocated, leaving no vacancies or discrepancies.

In other words, it seems obvious that at this late date no superimposed mistakes, or opposing contentions, of surveyors, officials, or land-claimants, nor even of the State itself, should be permitted to change what the crucible of time and the operation of the law thereby developed has so firmly settled and fixed.

■ Because, as to this land, which had thus been shown not to have remained a part of the public domain of Texas, after the State had so become a litigant in this proceeding in its own courts, it became subject, as were all the other parties therein, to our general laws of the State, including the law of evidence, hence alike became and is bound by the cited prior decisions of the courts settling the position of the surveys here involved as a matter of law adversely to its present claim for the vacancies. State v. Snyder, 66 Tex. 687, 700, 18 S.W. 106; Fristoe v. Blum, 92 Tex. 76, 80, 45 S.W. 998; United States v. Stinson, 197 U.S. 200, 25 S.Ct. 426, 49 L.Ed. 724; Chesapeake & Delaware Canal Co. v. United States, 3 Cir., 223 F. 926, L.R.A. 1916B, 734.

■ Finally, upon this feature, it is concluded that the Williams League was susceptible of location, hence had to be located from its own field notes; that the position on the ground of its east and north corners from the date it was titled to that of this trial was well known, as well as undisputedly shown, hence its west and south corners, together with its entire bodily structure, became fixed upon the ground, as a matter of law, by its own field-notes. Petty v. Paggi Bros. Oil Co., Tex. Com.App., 254 S.W. 565; Thomson v. Langdon, 87 Tex. 254, 259, 28 S.W. 931.

The determination that the Williams League is fixed upon the ground by its own field notes practically determines that the alleged vacancy sued for by the State as Tract 1 does not exist, because the west corner of the Williams determines the location upon the ground of the south corner of the B. B. B. & C. R. R. Survey No. 1, and the location of the south corner of the B. B. B. & C. fixes the location of the two A. C. H. & B. Surveys so far west as to exclude any vacancy between their west lines and the east lines of the H. T. & B. Surveys. At this point we make such a statement of facts as will explain why the court submitted special issues Nos. 1 and 2, making inquiries of the jury based upon "the Galveston-Brazoria County line as now monumented."

Since the Williams, the Perry & Austin, and the W. D. C. Hall Surveys were Austin Colony surveys, they were located before either Galveston or Brazoria County (or, for that matter, the Republic of Texas) ever came into existence. So no contention that these Austin Colony surveys were located with reference to the Galveston-Brazoria County line can be made. But, to the contrary, in 1848, the commissioners' court of the two counties employed Samuel P. Browne, a surveyor, to establish the Galveston-Brazoria County line. He took for the beginning point the point where Clear Creek crosses the line between the W. D. C. Hall and Perry & Austin Surveys. Thence he ran a traverse southwest and northeast and established as the next marked point of said Galveston-Brazoria line the point on Chigoe Bayou where three Cottonwood trees then stood (which point we will have occasion to refer to hereafter). Browne merely calculated the course and distance between the two said points—the course he calculated to be S. 10 W. It was not until 1896 that the line between said points was run and marked upon the ground; said line was marked by monuments placed at intervals between two said points; this was caused to be done by the commissioners' courts of the two counties, acting together. There is no uncertainty as to where the county line as thus monumented is located upon the ground, and no one in this suit questions the location of the county line as monumented.

Though the county line between the aforesaid points on Clear Creek and Chigoe Bayou was not monumented upon the ground until 1896, the officials of the General Land Office mapped its position upon the various maps of Brazoria County which they compiled before they received information as to where said line was monumented upon the ground. We here insert the Land Office map of 1883, as its showing of the position of the Galveston-

Brazoria County line is practically the same as that of the map of 1873, and it is with mapping of said line on these maps that we are concerned:

It will be noted from the 1883 map that the northern terminus of the county line is shown at the point where Clear Creek crosses the Hall-Perry & Austin Survey line. The officials of the Land Office necessarily had that information in their records, but, unfortunately, they did not have the information of· where, in relation to said line, Clear Creek crossed it. They mapped said northern terminus of the County line as being 4950 varas N. 45 E. from the west (or more properly, N.W.) corner of the Perry & Austin. Actually, as monumented upon the ground, said point is 5539 varas N. 45 E. from the west corner of the Perry & Austin. Said officials knew that the course of such line was S. 10 W. The consequence was that the County line was mapped upon the map of 1883 parallel to the line as it was later monumented upon the ground, with its beginning point 589 varas S. 45 W. from the beginning point as monumented in 1896. It will be seen on the 1883 map that said county line passes quite some distance west of the west corner of the Williams (which is called the Sarah McKissick on the 1883 map); and that it passes through the south corner of the B. B. B. & C. It will be noted from looking at the map first inserted above, which shows the positions of the County line as monumented upon the ground, that the County line as monumented on the ground passes within a few feet of the west corner of the Williams, and correspondingly east of the south corner of the B. B. B. & C.

■■ Naturally, the southern terminus of the County line is also mapped on the 1883 map correspondingly south and west of the monumented southern terminus of said County line. But this mismapping of the County line on the 1883 map, and on the 1873 map, cannot affect the true and known position of the west corner of the Williams, and of the surveys located with reference to the Williams, including its west corner. What was said in Humble Oil & Refining Co. v. State, Tex.Civ.App., 162 S.W.2d 119, 133, is applicable to the map situation just discussed: "Land Office maps do in proper cases furnish evidence of boundary locations. * * * But, after all, such maps are but compilations by Land Office officials from records in that office, and as such are but conclusions of those officials as to the effect of the records. Where * * * the records are in evidence, the maps cannot be given evidentiary significance beyond that which the records warrant."

In this connection it is proper to state that it is the State's contention and theory that the B. B. B. & C., if located according to its field notes, will be located so that its south corner· will fall in the County line as monumented in 1896. The State does not question that the south corner of the B. B. B. & C. as occupied upon the ground lies west ˙of the County line as monumented upon the ground. Nor does the State deny that, if the south corner of the B. B. B. & C., as now occupied upon the ground, was its true position in 1875 when the two A. C. H. & B. Surveys were made, no vacancy as Tract No. 1 exists. In other words, the State in effect admits that the existence of the vacancy designated as Tract No. 1 depends upon the true position of the south corner of B. B. B. & C. being in the County line as monumented in 1896. We agree with the trial court in setting aside the jury's verdict. in answer to special issues Nos. 1, 2, 3 and 4, and in entering judgment that the alleged vacancy designated as Tract No. 1 does not exist as a matter of law.

At this point, and before passing to the consideration of the alleged vacancy, Tracts Nos. 3, and 4, it is to be noted that after the two A. C. H. & B. Surveys were made in 1875, there then remained insufficient unappropriated land below or south of said surveys to be obtained from the State except under the Scrap Land Act. Under the Scrap Land Act the purchaser of scrap land was required to buy all of the scrap land, paying the State $2 an acre therefor. The provision of the Scrap Land Act will be discussed, so far as appropriate, in connection with the consideration of the alleged vacancy Tracts Nos. 3 and 4.

The alleged vacancies designated herein as Tracts 3 and 4 constitute one vacancy. The location of these tracts depends primarily upon the true location of the B. T. Masterson Survey in relation to the locations of the Galveston-Brazoria monumented county line, the A. C. H. & B. Survey No. 1 and the B. B. B. & C. Survey. In the event the Masterson Survey is located in accordance with its calls for the surrounding surveys in the Masterson Application to purchase, the surveyor's field notes and the patent under which it was issued, these vacancies do not exist, since before the claimants to these vacancies can

recover they must tear the Masterson away from its called for adjoinders with the B. B. B. & C. on the north and the two A. C. H. & B. Surveys on the west, and from its called for beginning point in the south line of the B. B. B. & C., which is also described as being the corner of the A. C. H. & B. Survey No. 1. They must also change the configuration of the Masterson from a trapezoid with its northwest line 302 varas in length to a triangle having no northwest line, and its acreage must be reduced from its original acreage of 126½ acres to 44 acres of land, free of conflict.

■ The primary purpose of this action is to ascertain where the surveyors who made the surveys actually laid the B. T. Masterson and the surveys actually called for in its field notes, or where the grantor, the State of Texas in this instance, actually intended the Masterson to be located in the event no actual survey was made on the ground. It is well established that, in order to determine this question, any call or calls sufficiently clear and definite to determine location will be observed. This rule applies to and includes adjoinders with senior surveys whose boundaries may be established by any of the recognized rules of construction of surveys and includes corners and lines determined by course and distance as well as those identified by natural objects on the ground. Kirby Lumber Co. v. Gibbs Bros. & Co., Tex.Com.App., 14 S.W.2d 1013.

As above stated, the locations of both the John R. Williams and the Perry & Austin Surveys are, we think, established, both as a matter of law and by the undisputed evidence in the record in this appeal.

The location of the W. H. Snider Survey is fixed by an adjoinder with both the Williams and the Perry & Austin. The survey was made by the surveyor, George W. Durant, in January 1860. It ties onto the entire southwest line of the Perry & Austin Survey and is fixed by its location. Its south line calls to run S. 45 W. a total distance of 1818 varas from the west corner of the Williams for its south corner, 602.17 varas of which is called for as being an extension of the south line of the Perry & Austin. This fact is significant in that it definitely locates the northwest boundary line of the B. B. B. & C. Survey.

The B. B. B. & C. Survey was also made by Durant in March, 1860, after the Snider was surveyed. Its field notes call to begin at the northwest corner of the J. R. Williams on the south line of the Perry & Austin and to run thence S. 45 W. 1818 varas to a Cedar stake; thence S. 45 E. 897 varas to a stake; thence N. 45 E. 1818 varas to a Cedar post in the J. R. Williams League line; thence N. 45 W. 897 varas to place of beginning.

While there is no express call in the field notes of the B. B. B. & C. Survey for the Snider, the call for 602 varas in the southeast line of the Snider, plus the 1216 varas from the west corner of the Williams to the south corner of the Perry & Austin, places the south corner of the Snider 1818 varas S. 45 W. from the west corner of the Williams in an extension of the south line of the Perry & Austin.

It is, we think, unquestioned that A. C. H. & B. Surveys Nos. 1 and 2 were office surveys made by the surveyor, Hennell Stevens, in 1875. A. C. H. & B. No. 1 calls for its beginning corner at the south corner of the B. B. B. & C. Survey "near the county line" and to run thence S. 10 W. 543 varas to a stake in the prairie; thence west 2121 varas to a stake on the east line of Section No. 36 H. T. & B. R. R.; thence north 2750 varas with the east line of Sections Nos. 36, 29 and 28, H. T. & B. R. R. to the line of the Snider, and thence south 45 E. 3133 varas with the line of the Snider and the H. T. & B. Surveys to the place of beginning.

A. C. H. & B. No. 2 calls to begin 543 varas S. 10 W. from the south corner of the B. B. B. & C. Survey, that being also the southeast corner of A. C. H. & B. Survey No. 1. The field notes then proceed by calls for course and distance which effect an adjoinder on the west with the east line of the H. T. & B. R. R. Block of surveys, thereby eliminating the claimed vacancy designated herein as Tracts 1 and 2.

After the B. B. B. & C. and A. C. H. & B. Surveys Nos. 1 and 2 had been laid in, an area was left between these surveys on the west and the Hoppel and Henry Surveys on the east entirely surrounded by patented land.

B. T. Masterson applied to the State for the purchase of this land. His application called for a tract of land bounded on the north and west by the B. B. B. & C., the A. C. H. & B. Surveys, and on the south and east by the Henry and Hoppel Surveys, under the Scrap Act of 1887. The application stated that the land was located in

Galveston County. It was made under the following field notes: "Beginning at a stake at the S. corner of the B. B. B. & C. R. R. Survey on line dividing Galveston and Brazoria counties, being also a corner of Survey No. 1 A. C. H. & B.; thence S. 10 W. 1414 varas to stake in N. W. line of William Henry Survey; thence N. 45 E. 1460 varas with said N.W. line of said Henry Survey to its east corner and stake in S.W. line of Robert Hoppel Survey; thence N. 45 W. 811 varas to stake, the W. corner of Hoppel Survey and the N. corner of this; thence S. 45 W. 302 varas to S. corner of B. B. B. & C. to place of beginning."

It will be noted that the field notes of the Masterson Survey call for it to begin at the south corner of the B. B. B. & C. Survey and the corner of A. C. H. & B. Survey No. 1. The field notes of A. C. H. & B. Survey No. 1 call for it to begin at a stake in the south corner of the B. B. B. & C. Survey "near the county line". The B. B. B. & C. Survey from the express calls in its field notes can be located only by first locating the John R. Williams League. It does not call for any other survey except the southeast line of the Perry & Austin. Its field notes call for it to begin at the west corner of the Williams Survey on the south line of the Perry & Austin and to run thence S. 45 W. 1818 varas (this 1818 varas is the sum of 1216 varas, the distance from the Williams west corner to the south corner of the Perry & Austin, plus 602 varas, the called distance from the Perry & Austin south corner to the south corner of the William H. Snider). Under these facts the location of the Masterson Survey is, we think, definitely fixed by adjoinders through connecting senior surveys with the John R. Williams Survey. It is undisputed, as above indicated, that the ground position of the monumented county line is near the west corner of the Williams Survey.

The only other question to be determined in the appeal with reference to Tracts 3 and 4 is whether the surveyor's general recital in his description of the land that it was located in Galveston County must give way to his specific calls for adjoinder to surrounding senior surveys which would fix a part of the survey in Brazoria County. The trial court held the reference to Galveston County to be of overwhelming significance.

The Scrap Act law of 1887 required that each scrap of land be purchased as a whole, and that, where the property was located in two counties, the surveyor of either county might locate it, but that the field notes of the land sought to be purchased must be filed in each county. In construing the Act, however, it has been held by the Supreme Court of this State that the failure on the part of the surveyor to file the notes in each county did not defeat the patent. Bohannan v. Hemby, 23 Tex. 475.

■■■ It has been uniformly held that where there is ambiguity in a conveyance, the surrounding facts will be looked to to ascertain the intent of the grantor and grantee, and that where two descriptions exist, one erroneous and the other correct, the latter will prevail. In the case of West v. Houston Oil Co., 46 Tex.Civ. App. 102, 102 S.W. 927, 929, this court, in passing upon a case in which the fact situation and the questions involved were similar in all material respects to those in the instant case, said: "The insertion in the description, of the statements that the land was situate in Jefferson county on Cabicera Bayou, and joining the land of Frances Valeres on the east, which statements, as applied to the only league of land granted by Nixon to McGee, and which McGee, as shown by his subsequent act, intended to sell and did sell to Dobson, are shown to be false, does not vitiate the true description and invalidate the deed; nor can the reference to the false testimonio which was delivered to Dobson with the deed have such effect. There is no ambiguity upon the face of the instrument, and the inconsistency in the descriptions arises when we attempt to apply them to the subject-matter of the sale. When it is shown by extrinsic evidence what was the subject-matter of the contract, and the land actually sold and purchased and intended to be conveyed is thus identified, the false portion of the description in the deed should be rejected as surplusage, and the instrument construed in conformity with the true intention of the parties."

This rule is also established by the following authorities: Berry v. Wright, 14 Tex. 270; Smith v. Chatham, 14 Tex. 322; Arambula v. Sullivan, 80 Tex. 615, 16 S.W. 436; Cartwright v. Trueblood, 90 Tex. 535, 538, 39 S.W. 930; White v. Luning, 93 U.S. 514, 23 L.Ed. 938; Norwood v.

Byrd, 1 Rich.Law, S.C., 135, 42 Am.Dec. 406.

■ In the instant case the subject matter of the Masterson application and the patent issued thereon was a tract of land surrounded by certain surveys called for therein. The field notes on which the patent was based called for an adjoinder with these surrounding surveys whose locations were fixed by adjoinders with senior surveys about whose location there was and is no dispute. It is undisputed that, at the time this patent was issued, the Galveston-Brazoria County line had not been run on the ground and that it was not monumented. Under these facts, we do not think that the insertion in the description of the surveyor Hoxie of the statement that the land in question was situated in Galveston County is controlling, or that it invalidated that portion of the grant which is shown by extrinsic evidence to lie in Brazoria County. The call in the patent for Galveston County must, we think, yield to the true facts as a matter of law. Shelley v. Creighton-McShane Oil Co., 62 Tex.Civ.App. 15, 130 S.W. 848, 849, writ refused; Arambula v. Sullivan, 80 Tex. 615, 619; Polk v. Carey, Tex.Civ.App., 247 S.W. 568; Buford v. Bostick, 50 Tex. 371.

It follows, under above authorities, that the alleged vacancies designated herein as Tracts 3 and 4 do not exist.

■ The rights of the claimants to recover the alleged vacancy designated in this appeal as Tract 5 depends to a large extent on the true location of the Robert Hoppel, the William Henry, and the B. T. Masterson Surveys. The alleged vacancy lies entirely within the claimed area of the Robert Hoppel Survey, with the exception of a small projection thereof which extends into the claimed area of the William Henry Survey. It lies southeast of the B. T. Masterson Survey.

In 1848 Samuel P. Browne located the A. H. Jackson, the Robert Hoppel, and the William Henry Surveys in the order named. The Jackson Survey calls to begin on the John R. Williams southwest boundary line and to run thence with said John R. Williams southwest boundary line N. 45 W. at 338 varas to a branch, and at 1258 varas a stake on the said John R. Williams S. W. Boundary line for the north corner of this survey; thence S. 45 W. at 1516 varas a stake for the west

corner of this survey; thence S. 45 E. at 78 varas a branch and 1258 varas a stake for corner; thence N. 45 E. 1516 varas to place of beginning.

The Robert Hoppel Survey calls to begin at the northeast corner of the Jackson Survey on the southwest boundary line of the John R. Williams Survey and to run thence with said Williams line N. 45 W. 1258 varas to a stake for the north corner of this survey in the Williams southwest line, 897 varas from the west corner of the Williams League. This call for the north corner of the Hoppel to be 897 varas from the west corner of the Williams League is significant, in that this distance is the length of the northeast boundary line of the B. B. B. & C. Survey, which adjoins the Hoppel on the north, the Williams on the west, and the Perry & Austin and the Snider on the south. This call of 897 varas from the west corner of the Williams survey is also significant, in that it fixes a crossing of Chigoe Bayou called for in the Jackson field notes as being 338 varas northwest of the east corner of the Jackson at 3075 varas S. 45 E. from the west corner of the John R. Williams Survey. The field notes of the Hoppel call to run thence S. 45 W. 1516 varas for its west corner; thence S. 45 E. 1258 varas for corner, the southwest corner of the Jackson; thence N. 45 E. with the Jackson northwest line to the place of beginning.

The William Henry Survey, which was made at the same time as the Jackson and the Hoppel Surveys, calls to begin on the southwest boundary line of the Jackson Survey at a point 458 varas from the west corner of the Jackson and the south corner of the Hoppel, and to run thence northwest with the southwest lines of the Jackson and Hoppel 905 varas for the north corner of this survey on the southwest boundary line of the Robert Hoppel Survey; thence S. 45 W. 1460 varas to the county line for the northwest corner of this survey; thence S. 10 W. with the county line 1500 varas to stake for south corner of this survey; thence N. 45 E. at 510 varas a branch, and 2770 varas to place of beginning.

It would serve no useful purpose to detail the voluminous evidence adduced in the trial court in connection with this alleged vacancy. Certain facts, however, are undisputed in the record: (1) The course and distance as given in the field notes of the William Henry Survey will not close

by approximately 70 varas; (2) when the field notes of the Henry Survey are pushed to a closure its acreage will include approximately 337 acres, instead of the 320 acres called for by Browne in the original field notes; (3) there is not sufficient distance on the ground between the fixed southwest line of the John R. Williams Survey on the east and the fixed county line on the west to allow Browne's full calls for distance for the Henry Survey from its fixed adjoinders with the Jackson and Hoppel Surveys.

The northeast line of the Henry Survey, we think, is locked in the position claimed for it by appellees, because of its fixed adjoinders with the southwest boundary lines and corners of the Hoppel and Jackson Surveys, which are fixed by adjoinders with the southwest boundary line of the Williams, and more definitely fixed by the crossing of Chigoe Bayou on the Williams southwest boundary line, called for in the Jackson field notes as being 338 varas northwest of the east corner of the Jackson Survey and shown to be a distance of 3075 varas S. 45 E. from the west corner of the Williams Survey, which is located on the ground as a matter of law.

Summarizing the facts as shown by the material testimony in reference to the location of the alleged vacancy designated as Tract 5, we find: (1) That the location of the Cottonwood trees on Chigoe Bayou is agreed to by all parties; (2) that the east corner of the Jackson Survey is on the southwest boundary line of the John R. Williams League 338 varas southeast of the point where the common boundary line of the Jackson and Williams Surveys is crossed by Chigoe Bayou; (3) that this crossing of the common line of the Williams and Jackson Surveys by Chigoe Bayou is 3075 varas S. 45 E. from the west corner of the John R. Williams League; (4) that the north corner of the Hoppel Survey is in the southwest boundary line of the John R. Williams League 897 varas southeast of the west corner of the Williams; (5) that the location of the Williams Henry Survey is fixed by its adjoinders with the Jackson and Hoppel Surveys; and (6) that the field notes and patent of the B. T. Masterson Survey call to adjoin the southwest boundary line of the Robert Hoppel and the northwest boundary line of the William Henry Surveys.

As above stated, it is the settled law in this State that in the event of an am-biguity in the description of property in a conveyance, the surrounding facts will be looked to to ascertain the intent of the grantor and grantee, and that where the description in a conveyance is susceptible to two constructions or descriptions, one erroneous and the other correct, the latter will prevail. In the instant case, when the Robert Hoppel and the William Henry Surveys are constructed by their adjoinders with the southwest line of the John R. Williams Survey and their adjoinders with the lines and corners of the Jackson Survey according to their field notes, and each are projected S. 45 W. their called distance, they will include all of Tract 5; and since the Masterson Survey calls for adjoinder with the lines of both the Hoppel and the Henry Surveys, and since no natural objects are found on the ground to break these adjoinders, and all of the land from the county line northeast to the southwest line of the John R. Williams and south of the southeast line of the B. B. B. & C. is patented land, the alleged vacancy designated as Tract No. 5, cannot, we think, exist as a matter of law.

We now come to the consideration of Tract 6. It lies immediately south of Tract 1. It is claimed by the State that Tract 6 has the same width, 247 varas, as that claimed for Tract 1. Such connection and coincidence as exist between Tract 1 and Tract 6 would suggest that the claim of these two vacancies must stand or fall together. This is particularly true when it is considered that the two A. C. H. & B. Sections are tied together, and have for their west lines the east line of the H. T. & B. Block of surveys; while the Hennell Stevens, which is admittedly a scrap land survey, is tied to the southernmost A. C. H. & B. Survey, having for its northern line the same identical line which the A. C. H. & B. has for its southern line, and has for its west line the east line of the H. T. & B. Block of surveys. It would at least seem illogical to hold that a point, when it is called for in the patent to the A. C. H. & B. No. 2, where it is designated the southwest corner thereof, to be in the east line of H. T. & B. No. 37, yet hold in the same case that the same point, when it is called for in the patent to the Hennell Stevens, where it is designated as the northwest corner of said latter survey, lies 247 varas east of said east line of the H. T. & B. No. 37. The mere fact, however, that such a holding would seem illogical

and inconsistent would not be enough necessarily to show that it would be wrong.

We note, however, that the question of the location of the boundary line between A. C. H. & B. No. 2 and the Hennell Stevens came before this court in the case of Wolf v. Scott, Tex.Civ.App., 253 S.W. 905, cited supra. In the Wolf v. Scott case, the Hennell Stevens was called the H. Kempner Survey (H. Kempner was the assignee of Hennell Stevens), and in said case the main issue was one of boundary between the A. C. H. & B. No. 2 and the Hennell Stevens. In said case it was held that the northwest corner of the Hennell Stevens is identical with the southwest corner of the A. C. H. & B. No. 2, and that the point constituting such two corners is located in the east line of the H. T. & B. No. 37. We fail to see why such decision is not here binding as stare decisis.

The map of 1883, inserted hereinabove, was current at the time survey of the Hennell Stevens was made, does of itself present evidence which would be sufficient to sustain a finding by a jury that the Hennell Stevens was actually an office survey. This, because it there appears that the southwest corner of the Magee is mapped in a position opposite and but 88 varas distant from H. T. & B. Survey No. 40, and below its northeast corner. In fact, the undisputed evidence in this case shows that the calls for course and distance made for the Hennell Stevens correspond approximately to what was shown by said map as being scrap or unappropriated land, then available for purchase. Whereas, upon the ground, the southwest corner of the Magee, instead of being opposite H. T. & B. No. 40 and distant therefrom approximately 88 varas, was actually opposite H. T. & B. No. 37, and distant therefrom some three hundred varas. The Magee was surveyed in 1854, and its southeast corner is the same point as the south terminus of the Galveston-Brazoria County line, and its east side runs with said county line. The southwest corner of the Magee is 1344 varas N. 80 W. from its southeast corner (which southeast corner was marked by the three Cottonwood trees). However, the Magee Survey was not directly related to H. T. & B. Survey. And we have seen that the northern terminus of aforesaid County line was mismapped on the map of 1883 as being south and west of where it was monumented in 1896. The result was, as heretofore stated, to mismap the southern terminus of the County line as being correspondingly south and west of its true ground position. Then, as the Magee was known to be joined to the south end of the County line, it was thus mapped out of position. We hold with reference to the contention that Tract 6 exists as a vacancy 247 varas wide, that the change of the mapped position of the County line as it existed on the map of 1883 to conform to said line as monumented, has not exposed nor created any vacancy upon the ground. The learned trial judge erred in holding that there was sufficient evidence before the jury to sustain its answers to special issues Nos. 9, 10, 11 and 12. Said holding was based upon the trial court's opinion that the testimony of the witness J. F. Durant, who was a chain carrier for Harris (who returned the field notes in 1885 upon which the Hennell Stevens was sold by the State in 1889), was sufficient to carry said issues to the jury and even to sustain their answers thereto. We have carefully examined Durant's testimony. We find that it fails as a matter of law to sustain the findings of the jury in response to the aforesaid special issues, and, taking all the evidence and all its implications most favorably to the State, such evidence as a matter of law establishes that no vacancy exists between the west line of the Hennell Stevens and the east line of H. T. & B. No. 37. And the judgment of the trial court holding that Tract 6 exists as a vacancy must be here reversed and rendered.

These conclusions determine the merits of the appeal. They require that the trial court's judgment finding Tracts 1 and 5 to constitute no vacancies be affirmed; that its disposition of Tract 2—not having been appealed from—be left undisturbed; and that its holding that Tracts 3, 4 and 6 constituted vacancies, substantially as claimed by the State, be reversed, and that the cause as to them be rendered in favor of the adverse parties.

Affirmed in part, undisturbed in part, and reversed and rendered in part.

MONTEITH, C. J., and GRAVES and CODY, JJ., concur.