**PARKER et al. v. STANDARD OIL CO. OF KANSAS et al.**

No. 12288.

Court of Civil Appeals of Texas. Galveston.

March 27, 1952.

Rehearing Denied July 10, 1952.

672

Louis W. Graves, Jr., of Houston, for appellants.

Turner, Rodgers, Winn, Scurlock & Terry, Carlton R. Winn, of Dallas, and L. A. Thompson, Jr., of Tulsa, Okl., for appellee Stanolind Oil & Gas Co.

R. H. Whilden, Barksdale Stevens, W. J. Williamson, of Houston, for appellee Shell Oil Co.

L. Alexander Lovett, Gilvie Hubbard, Rex G. Baker, Nelson Jones, Frank L. Heard, Jr., Vinson, Elkins & Weems, Tarlton Morrow, of Houston, and J. P. Jackson, of Dallas, for all other appellees.

CODY, Justice.

This was an action brought in trespass to try title by appellants to recover between 34 and 35 acres of land in the Hastings Oil Field, alleged by appellants to be wholly located within that portion of the B. T. Masterson Survey which lies in Brazoria County. Recovery of possession and title was sought, however, only subject to a mineral lease, given by C. H. Blount and

wife, Abbie J., to the Stanolind Oil and Gas Company, dated May 8, 1934, and which is appended to this opinion as Appendix "A". Appellants are the descendants of the Blounts and hold under them. The action was originally brought against two sets of defendants, namely (1) those defendants who claimed mineral rights to 13.958 acres of the land in controversy, which acreage was embraced in a larger tract, which was covered by a mineral lease given by Margaret Kidd to the Stanolind, and (2) those who claimed mineral rights to the remaining 20.208 acres of the land in controversy, which said acreage was embraced in a larger tract, which was covered by a mineral lease which was also given by the Sneeds to the Stanolind.

The Stanolind became a party by intervening in order to assert, among other things, that appellants were seeking by their action to disturb the location of the lines of the B. T. Masterson Survey, as the same had been determined in the Franco-American case (State v. Franco-American Securities), Tex.Civ.App., 172 S. W.2d 731, and in the Alexander case (Alexander v. Stanolind Oil & Gas Co.), Tex. Civ.App., 192 S.W.2d 781; said determination being alleged to have been made so as to fix the location thereof under the doctrine of stare decisis.

The defenses plead by defendants respectively were limitations. The Stanolind also urged that defendants, and those under whom they claimed had acquired title by adverse possession. The appellants plead various pleas of estoppel against the Stanolind, etc. It is proper to add that the various defendants also urged various pleas against the Stanolind.

At the conclusion of the evidence, the various parties urged various motions for directed verdicts. We deem it sufficient to state with reference thereto, that the court granted the motion of the Stanolind for a directed verdict that the disputed boundary line of the Masterson was fixed as a matter of law under the doctrine of stare decisis, etc. The court submitted issues on limitations to the jury of five, ten and twenty-five years prior to January 6, 1949. And all issues on limitations submitted were answered adversely to appellants. The court rendered judgment that appellants should not recover any of the mineral rights, interest and estate sued for. The pleas urged against the Stanolind by its co-appellees were not reached, and the court did not render judgment thereon.

Appellants predicate their appeal upon thirty formal points which, even though stated concisely, cover some seven pages of their brief. Manifestly said points cannot be stated in this opinion, or discussed individually. But they present three principal issues to be determined on this appeal, as follows:

I. Did the court err in fixing the southeast boundary line of the Masterson Survey upon the ground? And particularly was it error for the court to adjudge that the location of said boundary was fixed by the doctrine of stare decisis?

II. Is an oil operator who takes overlapping leases, from which he is producing oil from wells located in the overlapping area, entitled to invoke the "saving clauses" (sometimes called "lesser estate" clauses) of his leases in order to protect himself against liability to make royalty payments, except under the lease given by the lessor, or his successors, who actually owned the land at the time it was leased? And, if so, is the operator entitled to such protection under the facts of this case?

III. Did the court err in rendering judgment to the effect that appellants take nothing, insofar as said judgment is based upon the fact issues with respect to which it was determined that the respective appellees acquired title to the area in dispute by adverse possession?

The land in dispute is shown on the following map, which is the same map shown in the Franco-American case, 172 S.W.2d at page 734, and shown in the Alexander case, 192 S.W.2d at page 783. (See page a-1, Appellee Stanolind's brief.)

This is Browne's original county line traverse beginning at Clear Creek and running to the cottonwoods on Chigoe (141-A-B-142).

AREA IN CONTROVERSY

Plaintiffs would locate the southeast line of the Masterson at this red dashed line; in conflict with the senior William Henry and with the Jennie Sneed; contrary to the judgments in the Franco and Alexander cases.

THOMAS CHOATE LEAGUE
TITLED JANUARY 18, 1832

JOHN DICKINSON LEAGUE
TITLED AUGUST 19, 1824

SCALE: 1 INCH = 2000 VARAS

MAP - 1

So far as this case involves the controversy of the proper location of the southeast boundary of the Masterson, it is another controversy with respect to the proper location of the boundaries of original surveys located in the Hastings Oil Field, which has arisen out of the mismapping of the Brazoria-Galveston County line upon the maps of the General Land Offices for 1883, and prior years. See such a map shown in the Franco-American case, 172 S.W.2d at page 739. The history of such mismapping is sufficiently set forth in the opinion in that case.

■ Just what is the doctrine of stare decisis in Texas, as applied to boundary disputes? And, how is it applied? In the present state of holdings by the appellate courts of the State, it is difficult to state just what the limitations on the application of the doctrine are.[1] The reason for such uncertainty as exists is, of course, that the doctrine of stare decisis is, by definition, limited to the binding force of a precedent by the court of last resort when a point of law has been settled, particularly when the precedent fixes a rule of property. Whereas, the determination of the location on the ground of a disputed boundary line is, in its nature, a question of fact.

It is held in Joslin v. State, Tex.Civ. App., 146 S.W.2d 208, 212, writ refused, that the doctrine of stare decisis applies to questions of law only, involves no estoppel, and operates on all persons and not merely on those to the particular proceeding and their privies. Said the court, giving examples, " * * * as the construction by the court of last resort, of a written instrument, or of a judgment, *or the adjudication of the boundaries of a particular survey. The latter instance is one which most frequently occurs."* (Emphasis supplied.)

Once it had become settled that, where the Supreme Court had determined the legal effect of a particular instrument in writing which involved property rights, such effect would thereafter continue to be given to such instrument no matter in what proceeding the issue might thereafter arise, it became inevitable that the doctrine of stare decisis would include the location of a disputed boundary line. This, because every deed conveying land, in order to be valid, must be in writing; a deed to land affects property rights; and, unless the deed describes some particular piece of land which can be located from said description, said instrument in writing is not valid as a transfer. In other words, the very essence of an instrument in writing as a deed of conveyance is that its boundaries shall be so located as to affect a particular piece of the face of the earth.

It is inferable from the holding made in Eppenauer v. Ohio Oil Company, 5 Cir., 98 F.2d 524, that the doctrine as applied in Texas may possibly be limited to the determination by the Supreme Court of the location of the boundaries of original surveys, in actions wherein the State is a party, and is seeking to establish the existence of a vacancy in conflict with the boundaries of original surveys, as contended for by patentees, or their privies. The location of original surveys is a matter of public concern, and is made by an official surveyor, the field notes of which are returned to the General Land Office, and become a part of its records. Original surveys were not ordinarily concerned with a small tract of small value. And a suit by the State to establish a vacancy is a matter of notoriety. And it may be safely assumed that in such a suit, the best evidence of the location of a disputed boundary will be forthcoming. And after the determination by the Supreme Court of a disputed boundary, in such an action, no one should be allowed to bring forward new contentions as to the true location, based on new theories, and thus speculate on unsettling what amounts to settled rights. In short, a question of land title is not a disembodied question of law but relates to specific land.

■ We do not undertake to pass on whether the doctrine of stare decisis is limited to the determination by the Supreme Court of a disputed boundary line in a suit wherein the State was a party. However

---

1. See article by Prof. Hodges, 21 Texas Law Review 241–276, wherein the thesis is urged that little light is thrown on the subject by the adjudicated cases.

that may be, in the Franco-American case, the State was a party endeavoring to establish the existence of vacant land belonging to the State, and disputing the location of the boundaries of original surveys. Therefore, if the doctrine be so restricted, that case presented a situation wherein a determination of a disputed boundary by the Supreme Court was stare decisis. The Supreme Court did not approve the opinion in that case, but it did approve the judgment rendered therein as correct by dismissing the application for writ of error, for want of merit.

It was held by this Court, at page 744 of 172 S.W.2d, "The northeast line of the Henry Survey, we think, is locked in the position claimed for it by appellees, because of its fixed adjoinders with the southwest boundary lines and corners of the Hoppel and Jackson Surveys, which are fixed by adjoinders with the southwest boundary line of the Williams, * * *." It was essential to the judgment as to whether the vacancy, described in said case as the "fifth vacancy," existed, to determine the correct location of the northeast line of the Henry Survey. The approval by the Supreme Court of that judgment, makes the location of the northeast line of the Henry stare decisis. The location of said line cannot be in one place, as a necessary support of the judgment that the fifth vacancy did not exist, and moved about to another position for the determination of the northwest boundary of the Henry, which is the same line as the southeast line of the Masterson. The court correctly determined that the southeast boundary of the Masterson was stare decisis by virtue of the Supreme Court's action approving the judgment rendered in the Franco-American case. We deem it unnecessary to extend this opinion to discuss whether the location was fixed by res adjudicata, or estoppel by judgment under the Franco-American case. The Alexander case, supra, does not have the effect of establishing the location of the southeast line of the Masterson in Brazoria County. This, because it is clear that the Supreme Court approved the judgment in that case upon the ground that the action to question the validity of

the patent in question was barred, as filed too late. In addition, since the Jennie Sneed Survey is junior to the Masterson, the location of the southeast line of the Masterson, which is common to the Jennie Sneed, will fix the location of the northwest terminus of the Jennie Sneed.

No party to this suit is in a position to, or does question that the southwest boundary of the Henry coincides with the Brazoria-Galveston County line, as monumented on the ground. It was held in the Franco-American case that the westerly boundary of the Masterson was not fixed by the location of the said county line. When, therefore, the mismapping of said county line was discovered, and it was learned that the southwest line of the Henry did not extend to the east line of the A. C. H. & B. No. 2, as delineated on erroneous General Land Office maps, a vacancy was uncovered in Brazoria County, between the county line and the east line of A. C. H. & B. No. 2. The State issued patents to the good-faith occupants of said vacancy under the applicable statute. However, the first call contained in the field notes of the Masterson patent (which patent is appended hereto as Appendix "B") reads: " 'Beginning at a stake at the S. corner B. B. B. & C. R. R. [Co.] Survey on line dividing Galveston and Brazoria County, being also a corner of Survey No. 1 A. C. H. & B.; thence S. 10 W. 1414 varas to stake in N. W. line of William Henry Survey". The next call reads: "Thence N. 45 E. 1460 varas with said N. W. line of said Henry Survey to its east corner and stake in S. W. line of Robert Hoppel Survey * * *." So, if the first call for 1414 varas distance should be allowed (on the basis that there is a vacancy there), the Masterson southeast line, within Brazoria County, would overlap the Jennie Sneed something over six acres.

As was stated in the Franco-American case, B. T. Masterson applied to purchase the survey which now bears his name, under the Scrap Act law of 1887, Gen.Laws 1887, c. 80. The terms of that law was an offer by the State, made through the Legislature, to sell tracts of land which were not in

excess of 640 acres, and which were cut off from the public domain by reason of being completely surrounded by tracts of land which the State had disposed of. By the terms of his application, made pursuant to said Act, Masterson accepted said offer. His application to purchase reads, so far as is material, "Fifth: The vacant land North West of the William Henry, Southwest of Robert Hoppel, Southeast of the B. B. B. & C. R. R. Co., and East of the A. C. H. & B. Surveys Nos. 1 and 2." It is quite evident that he took his description of the Scrap land he was seeking to buy from the official map of the General Land Office, which was then current, and which is shown on page 739 of 172 S.W.2d.

The intention of the public officials who issued the patent, and of Masterson, was to comply with the law, and to grant Masterson a fill-in survey. The language of the patent itself makes this manifest reading, "and in accordance with the Laws of the State in such case made and provided." Therefore, when it became adjudicated that the called-for Brazoria-Galveston line as the west line of the Masterson was not controlling, but that the Masterson took for its west line the east line of the A. C. H. & B. Surveys, it is manifest that the call for distance along the A. C. H. & B. Surveys must give place so that the second call will join up with the northwest boundary of the Henry. Lilly v. Blum, 70 Tex. 704, 6 S.W. 279, and cases there cited. For the purposes of this case, the southwest line of the Henry stops in the county line as monumented, and does not extend to the east line of A. C. H. & B. No. 2, as all parties deemed that it did when the patent was issued. But the intention is as clear as language can make it, that the call for distance should extend only to the point where it was thought that the county line located the joinder of the Masterson with the Henry. It is clear that the Masterson is an office survey. The purported chainmen used by Hoxie, the surveyor, were those used by Browne in 1848 in making the Jackson, Hoppel, Henry and Sloan Surveys. And it was proved on the trial of the Franco-American case that one of them had long been dead at that time.

We hold that, by force of the Scrap Act law, the first call for distance must be deemed to stop at the point where the second call will in a straight, unbroken line join the northwest line of the Henry, as the southeast line of the Masterson.

The court submitted four special issues to the jury on limitations. The first special issue reads:

Special Issue No. 1

"Do you find from a preponderance of the evidence that D. J. Ryan, and those holding deeds by, through and under him, either in person or through a tenant or tenants, or partly in person and partly through a tenant or tenants, hold exclusive, peaceable and adverse possession of the land in controversy in this suit, cultivating, using or enjoying the same, for any period of ten years or longer prior to January 6, 1949? * * *."

To which the jury answered, "We do."

In 1891 D. J. Ryan purchased the north half of A. C. H. & B. Survey No. 2, and undertook to enclose it with a fence. Instead he enclosed a large part of A. C. H. & B. Survey No. 1, and failed to enclose a large part of the north half of A. C. H. & B. Survey No. 2. In 1898, which was about two years after the Brazoria-Galveston County line was monumented, Burnett and Masterson, who owned A. C. H. & B. Survey No. 1, sued Ryan in trespass-to-try-title. In his answer Ryan expressly stated that he had only intended to occupy his own land, and had by error occupied a part of A. C. H. & B. Survey No. 1. He thereupon vacated the land—any part of A. C. H. & B. No. 1.

The undisputed evidence shows that Ryan thereafter put up fences which enclosed the tract which, on September 23, 1911, he described on a plat which he designated D. J. Ryan's Subdivision of the North Half of Section No. 2, A. C. H. & B. Survey in Brazoria County, Texas. He filed said plat, copy of which we here insert. There is indicated thereon the land here in controversy. (See page 32-a, Appellee Stanolind's brief.)

678

PLAT
"OF"
D. J. Ryan's
Subdivision of the North half of Section No. 2
A.C.H.&B. Survey in
Brazoria County Texas

Scale 200 vs. 1" All measurements in vrs.
Surveyed Jan. 30, 1911 By J.H. Dawson
Alvin Texas Surveyor

Galveston & Brazoria County Line

THE AREA IN CONTROVERSY

Sold
39.39 Acs

D.J. RYAN'S
HOMESTEAD
RESERVE
35 Acs

East 2291.22 Vs.
West 2121. Vs.

23  24  25  26  27  28  29
22  21  20  19  18  17
1  2  3  4  5  6  7  8  9  10  11  12  13  14  15  16

MAP - 6

The plat, indeed, covers the north half of the A. C. H. & B. Survey No. 2, which at its west end abuts on the Alvin-Pearland Highway, but it extends to and is bounded by the Brazoria-Galveston County monumented line, at its east end. There is evidence in the record which will support the inference that Ryan's fences were maintained about his said tract from as early as 1900 until he filed his plat on September 23, 1911, which is more than ten years.

The evidence shows that he and his wife lived in a house on his land from as early as 1896. Except for strawberries and melons, which he raised about his house, he used the land exclusively for pasturage. Up until the time he sold all of his unsold lots, which was in 1918, he paid taxes annually on not less than three nor more than six horses and mules. And the number of head of cattle he paid taxes on annually varied from twenty-two to forty-nine. His cattle were dairy cattle, which it was necessary to protect from range cattle. His fence consisted of a two-wire fence, but there was evidence to the effect that the fence was so maintained as to be effective for keeping range cattle out, and dairy cattle in.

The evidence shows the following:

That on November 22, 1913, D. J. Ryan and wife conveyed Lots 23, 24 and 25 of D. J. Ryan's aforesaid subdivision, "conveying thirty-one and 4/10 (31.4) acres of land," to C. J. Herrick. Thereafter C. J. Herrick conveyed the land so described to Samuel A. Kidd. Thereafter by will, Samuel A. Kidd devised said lots to his wife, Margaret Kidd. Margaret Kidd, on April 27, 1934, executed a mineral lease to an agent for the Stanolind.

The evidence further shows:

That on October 24, 1918, D. J. Ryan and wife conveyed all of their then unsold lots in the subdivision to J. W. Surface, which lots included Lots 1 to 9, inclusive, and Lots Nos. 21 and 22. Thereafter on February 1, 1929, the said Surface conveyed said Lots 1 to 9, inclusive, and Lots 21 and 22 to H. G. Sneed and Gilbert Sneed, and it was recited said lots contained 100 acres of land. Thereafter, on April 25, 1934, Gilbert Sneed and wife, Jennie Sneed, and H. B. Sneed and wife, executed a mineral lease to the Stanolind on said land.

Since we deem the evidence of the adverse possession and use by D. J. Ryan up until the date he filed the aforesaid subdivision sufficient to support the jury's answer to special issue No. 1, we will not review the evidence which the appellees urge is sufficient to establish adverse possession after said date, and under the other special issues.

We fail to see that, as to appellants, the form of special issue No. 1, constituted reversible error. The evidence was sufficient to support the jury's answer to special issue No. 1 in that there was a ten-year period from 1900 until the plat was filed on September 23, 1911, during which Ryan was holding the land in controversy adversely, so as to mature limitation title.

We do not pass on whether the road shown on the plat was dedicated to the public. Assuming that there was such a dedication, what was dedicated was a right of way, and the mineral estate was not affected thereby. And the owners of the lots abutting thereon own to the middle of the street, subject to the right-of-way,—always assuming there was an effective dedication.

This brings us to the consideration of the title by which appellants claim the 101.25 acres which they sued to recover.

By a regular chain of conveyances the title to the Masterson Survey became vested in James S. Montgomery and John N. Stowe. In 1907, by partition deed, there was set aside to Stowe what purported to be the northeast 25.3 acres in the Masterson (which purported 25 acre tract is now known as the Annie Schaefer tract), and the balance of the Masterson, which purported to be 101.25 acres was set aside to Montgomery. Thereafter, H. L. Tolar et al. who owned the record title to said 101.25 acres conveyed same to the Blounts by deed dated August 18, 1913.

As appears from the description of the land on which the Blounts granted the Stanolind lease, on March 8, 1934, which, as heretofore stated, is hereto attached as

Appendix "A", said lease covered by its terms 101.25 acres, which included the land here in controversy. At the time the Stanolind took the Blount lease, it held the Margaret Kidd, aforesaid, and the Sneed leases. The Kidd lease and the Sneed lease were mutually exclusive, but the Kidd lease covers 13.958 acres of the land in controversy, and the Sneeds' lease, given prior to the date on which the Blount lease was given, covers 20.208 acres of the land in controversy.

It is the settled law, of course, that as long as the title of the landlord is the same as it was at the time the tenancy was created, and the tenant is not disturbed in his possession, it is immaterial whether the title of the landlord was a valid one, insofar as the estoppel of the tenant to attack it is concerned. Lorino v. Crawford Packing Co., 142 Tex. 51, 175 S.W.2d 410. And under such authorities as Greene v. White, 137 Tex. 361, 153 S.W.2d 575, 136 A.L.R. 626, appellants contend that the Stanolind as lessee in the Blount lease is estopped to deny the Blounts' title to the land in controversy.

The contract of sale under which the Blounts sold the mineral lease to the Stanolind is attached to this opinion as Appendix "C". It contains a provision that the land shall be surveyed and if it is discovered that it contains less acreage than is specified in the lease, then the lessors shall substitute a new lease in all respects the same as that which has been deposited in escrow except that it shall correctly specify the number of acres.

If we are right in our view of the title of the Blounts to the land in controversy, it has not changed since the lease was delivered to the Stanolind. The Stanolind knew the state of the title at the time it took the lease, and knew what the survey of the Blounts' tract revealed then as to its acreage, as well it now knows. Indeed, the evidence shows that the Stanolind insisted that the Blounts execute a new lease which would cover the land on which they then owned title, and accept the bonus payment on the basis of the acreage to which they held good title. But the bonus value had greatly advanced,

and the Blounts, acting under advice of their lawyer (who apparently shared the view that the Blounts had lost title to the land in controversy) declined to comply with said provision, and in effect referred the Stanolind to its remedy at law if it did not pay for 101.25 acres, and accept the lease as drawn.

The Stanolind complied, and paid the $15,000, plus. Thereafter it paid delayed rentals on the basis of 101.25 acres. However, the Stanolind has never made any royalty payment under the Blount lease on the basis of ownership of the land in dispute. The Stanolind completed producers on the land in controversy under the Kidd and under the Sneed leases in 1936, and has paid the royalty thereon under said leases since said date, at least until this suit. Appellants and their predecessors, until this suit, with knowledge evidenced by reports stating loss of title by conflicts, acquiesced.

In our opinion, when the Blounts declined to permit the delivery of the lease unless it be paid for on the basis of 101.25 acres, the Stanolind had the remedy either to seek specific performance, or to pay for the lease on the basis of 101.25 acres. But in either case, when the lease became a delivered instrument, its terms fixed and determined the rights of the parties. And what said rights are with respect to payment of royalties must be determined by the terms of the lease.

A mineral lease is the conveyance of a determinable fee interest in land. The intention of the parties to a mineral lease is that minerals shall be produced from the land lease, and shared as therein specified. In construing the lease, the intention of the parties to it, as therein expressed, must prevail. See Bumpass v. Bond, 131 Tex. 266, 271, 114 S.W.2d 1172.

It has been settled that a mineral lease does not in all respects create the relationship of landlord and tenant. Shell Oil Co., Inc., v. Howth, 138 Tex. 357, 367, 159 S.W.2d 483, 490, and cases there cited.

In the case just cited the Shell held a lease which contained the following "lesser estate" or "saving" clause which

reads: " 'If lessor owns a less interest in the above described land than the entire undivided and [un]qualified fee simple estate therein, then all royalties and all rental and other moneys herein provided shall be paid or delivered to lessor only in the proportion which lessor's interest in said land bears to the entire undivided and unqualified fee simple estate.' " And the Supreme Court held, "By virtue of the provisions in the lease above quoted, the fact that Shell Company took the Gregory lease did not make that Company a wrongdoer against the rights of Howth. The Shell Company, as a lessee of Howth, under the provisions of its lease had the right to take a similar lease from an adverse claimant to the property or any portion thereof, in order to protect its own title or interest in the land." See also Reeves v. Republic Production Co., Tex.Civ.App., 177 S. W.2d 1011, writ refused, W. M.

In substance the Supreme Court held in the Howth case that, in virtue of the "lesser estate" or "saving" clause with respect to the payment of royalties that the Shell was only bound to pay Howth on the basis of "a full ⅛ royalty on the entire tract."

In this case the Sneed, Kidd and Blount leases contain "saving" clauses which are the legal equivalent of that contained in the Howth lease. The Stanolind had the right to protect itself by taking leases from adverse claimants, actual or potential. And under the Howth case, in virtue of the agreement of the parties, the Stanolind is liable only on the basis of a full ⅛ royalty to the true owner.

We believe no reversible errors of procedure were made by the Court.

The judgment of the trial court is affirmed.

### Appendix "A"

C. H. Blount et ux. Abbie J. Blount

To

Stanolind Oil & Gas Company

Oil, Gas and Mineral Lease
Dated: May 8th, 1934
Filed: June 12th, 1934
Recorded: Vol. 502, Page 128
Deed of Trust Records of Galveston County, Texas.

This Agreement made this 8th day of May 1934, between C. H. Blount and wife, Abbie J. Blount, of Houston, Harris County, Texas, Lessor (whether one or more), and Stanolind Oil and Gas Company, Lessee, Witnesseth:

1. Lessor in consideration of Ten Dollars ($10.00) in hand paid, of the royalties herein provided, and of the agreements of Lessee herein contained, hereby grants, leases and lets exclusively unto Lessee for the purpose of investigating, exploring, prospecting, drilling and mining for and producing oil, gas and all other minerals, laying pipe lines, building tanks, power stations, telephone lines and other structures thereon to produce, save, take care of, treat, transport and own said products, and housing its employees, the following described land in Galveston and/or Brazoria County, Texas, to-wit: 101.25 acre tract, and being all of the Branch T. Masterson Survey described in the Patent thereof from the State of Texas to Branch T. Masterson, dated 10/16/90, recorded in Vol. 136, page 386, Deed Records of Galveston County, Texas, Except that certain 25.3 acre tract described in a partition deed between James S. Montgomery and John N. Stowe, dated 5/17/07, recorded in Vol. 221, page 452, Deed Records, Galveston County, Texas. It is the intention that this lease shall also include all land owned or claimed by Lessor adjacent or contiguous to the land, particularly described above, whether the same be in said survey or surveys or in adjacent surveys.

2. Subject to the other provisions herein contained, this lease shall be for a term of five years from this date (called "primary term") and as long thereafter as oil, gas or other mineral is produced from said land hereunder.

3. The royalties to be paid by Lessee are: (a) on oil, one-eighth of that produced and saved from said land, the same to be delivered at the wells or to the credit of Lessor into the pipe line to which the wells may be connected; Lessee may from time to time purchase any royalty oil in its possession, paying the market price therefor prevailing for the field where produced on the date of purchase; (b) on gas, including casinghead gas or other

gaseous substance, produced from said land and sold or used off the premises or in the manufacture of gasoline or other product therefrom, the market value at the well of one-eighth of the gas so sold or used, provided that on gas sold at the wells the royalty shall be one-eighth of the amount realized from such sale; where gas from a well producing gas only is not sold or used, Lessee may pay as royalty $50.00 per well per year, and upon such payment it will be considered that gas is being produced within the meaning of Paragraph 2 hereof; and (c) on all other minerals mined and marketed, one-tenth either in kind or value at the well or mine, at Lessee's election, except that on sulphur the royalty shall be fifty cents (50¢) per long ton. Lessee shall have free use of oil, gas, coal, wood and water from said land, except water from Lessor's wells, for all operations hereunder, and the royalty on oil, gas and coal shall be computed after deducting any so used. Lessor shall have the privilege at his risk and expense of using gas from any gas well on said land for stoves and inside lights in the principal dwelling thereon out of any surplus gas not needed for operations hereunder.

4. If operations for drilling are not commenced on said land on or before one year from this day the lease shall then terminate as to both parties, unless on or before such anniversary date Lessee shall pay or tender to Lessor or to the credit of Lessor in The City National Bank at Houston, Texas, (which bank and its successors are Lessor's agent and shall continue as the depository for all rentals payable hereunder regardless of changes in ownership of said land or the rentals) the sum of Twenty-five Dollars per acre ($25.00 per acre) (herein called rental), which shall cover the privilege of deferring commencement of drilling operations for a period of twelve (12) months. In like manner and upon like payment or tenders annually the commencement of drilling operations may be further deferred for successive periods of twelve (12) months each during the primary term. The payment or tender of rentals may be made by check or draft of Lessee mailed or delivered to said bank on or before such date of payment. If such bank (or any successor bank) should fail, liquidate or be succeeded by another bank, or for any reason fail or refuse to accept rental, Lessee shall not be held in default for failure to make such payment or tender of rental until thirty (30) days after Lessor shall deliver to Lessee a proper recordable instrument, naming another bank as agent to receive such payments or tenders. The down cash payment is consideration for this lease according to its terms and shall not be allocated as mere rental for a period. Lessee may at any time execute and deliver to Lessor or to depository above named or place of record a release or releases covering any portion or portions of the above described premises and thereby surrender this lease as to such portion or portions and be relieved of all obligations as to the acreage surrendered, and thereafter the rentals payable hereunder shall be reduced in the proportion that the acreage covered hereby is reduced by said release or releases. In this connection the above described premises shall be treated as comprising 101.25 acres, whether there be more or less.

(Provisions not germane to this suit).

9. Lessor hereby warrants and agrees to defend the title to said land and agrees that Lessee at its option may discharge any tax, mortgage or other lien upon said land and in event Lessee does so, it shall be subrogated to such lien with the right to enforce same and apply rentals and royalties accruing hereunder toward satisfying same. Without impairment of Lessee's rights under the warranty in event of failure of title, it is agreed that if Lessor owns an interest in said land less than the entire fee simple estate, then the royalties and rentals to be paid Lessor shall be reduced proportionately.

In Witness Whereof, this instrument is executed on the date first above written.

(ending on page 1518 Vol. V.S.F.)

C. H. Blount,
Abbie J. Blount, Lessor
Stanolind Oil and Gas Company, Lessee.

By E. H. Stafford, Agent

(Acknowledgments)

### Appendix "B"

Patent

Dated October 16, 1890
Filed February 17, 1896
Recorded Vol. 136 Page 386
Records County Clks. Offs.
Galveston County, Texas.

State of Texas
To
Branch T. Masterson
No. 420   In the Name of the State of Texas
Vol. 11

To all to Whom These Presents shall come Know Ye I, L. S. Ross Governor of the State aforesaid by virtue of the power vested in me by law and in accordance with the Laws of said State in such case made and provided do by these presents Grant to Branch T. Masterson his heirs or assigns Forever, One Hundred and Twenty Six & 1/2 (126–1/2) acres of land, situated and described as follows.   In Galveston County on the Waters of Clear Creek about 29 miles N. 61 W from the City of Galveston.   Said land having been purchased and fully paid for in accordance with an act Approved March 29th 1887 Chap 80 Page 61 Genl Laws 1887.   Beginning at a stake at the S. cor of B. B. B. & C. R. R. Co. Sur. on line dividing Galveston from Brazoria County being also a cor of Sur. No. 1 A. C. H. & B.   Thence S. 10 W 1414 Vrs. to stake in N. W. Line of Wm. Henry Sur.   Thence N. 45 E 1460 vrs with said N. W. line of Henry's sur to its E cor. a stake in S. W. line of Robert Hoppel Sur. Thence N. 45. W 811 vrs. to stake the W. cor of said Hoppel & N. cor of this sur. Thence S. 45 W. 302 vrs. to S. cor of said B. B. B. & R. R. Co. Sur. & the beginning. Hereby relinquishing to him the said Branch T. Masterson and his heirs or assigns forever all the right and title in and to said land, heretofore held and possessed by the said State, and I do hereby issue this Letter Patent for the same.

In Testimony Whereof, I have caused the Seal of the State to be affixed as well as the Seal of the General Land Office Done at the City of Austin on the Sixteenth day of October in the year of our Lord One Thousand eight Hundred and Ninety.

(Seal)   L. S. Ross Governor
(Seal)   R. M. Hall
Commissioner of the Gl. Ld. Office.

### Appendix "C"

Houston, Texas,
May 8, 1934.

The City National Bank,
Houston, Texas.
Gentlemen:

We hand you herewith the following instruments:

(A) Oil, gas and mineral lease, dated 5-8-34, from C. H. Blount and wife, Abbie J. Blount, as Lessors, to Stanolind Oil and Gas Company, as Lessee, covering 101.25 acres of land, more or less, out of the B. T. Masterson Survey, Abstract No. ——, Galveston County, Texas;

(B) Draft No. 3775 of the Stanolind Oil and Gas Company, dated 5-8-34, in the sum of $15,187.50, payable to the City National Bank, of Houston, Texas.

You are to dispose of the oil, gas, and mineral lease and the proceeds of the draft in the form and manner and under the following conditions:

C. H. Blount and wife, Abbie J. Blount, herein called Lessors, agree to sell, and Stanolind Oil and Gas Company, herein called Lessee, agrees to buy, the above described oil, gas, and mineral lease, paying therefor at the rate of $150.00 per acre for the number of acres covered by said lease and owned by Lessors in said survey.

Lessors agree to furnish to Lessee a complete abstract of title covering the above described property, certified to the latest possible date, and Lessee shall have five days after the receipt of such complete abstract within which to have the same examined and to present to Lessors or to Lessors' agent a written title opinion, setting forth the objections to such title. Lessors shall have five days from the date of the delivery of such title opinion within which to meet the objections set forth therein.   If, at the expiration of said five-day curing period, Lessors have not complied with the material requirements made in said title opinion, the Lessee shall have five additional days within which to make

an effort to cure such unsatisfied material requirements. Lessee may at any time before the expiration of the various periods of time herein provided for waive any unsatisfied requirements, and upon notice to you that it has so waived such requirements you will be authorized to deliver the proceeds of the draft to the Lessors and the lease to the Lessee or its authorized agent.

Lessee and Lessors contemplate that this land shall be surveyed, the survey to be completed before the expiration of the last five-day period named above. The survey shall be made at the instance and expense of Lessors. If such survey reveals that the tract above described contains less than 101.25 acres, upon joint advice by the parties hereto of such fact, you are authorized to deliver the lease to Lessee and so much of the proceeds of the draft to Lessors as may be necessary to pay for the number of acres shown to be actually in the tract at the rate of $150.00 per acre, and you are authorized to deliver to Lessee the unexpended portion of the proceeds of the draft.

In the event that the survey reveals that the above described tract contains less than 101.25 acres, Lessors agree to execute, and Lessee agrees to accept, an oil and gas lease containing precisely the same terms and conditions as that lease which is escrowed herewith, except that the new lease shall describe the land which said title examination and survey determine is owned by Lessors, the same to be delivered by Lessors to Lessee when the consideration is paid, as provided in the paragraph next preceding.

It is the agreement and understanding of Lessors and Lessee that this lease shall be consummated as to that portion of said tract to which Lessors are shown by said abstract and survey to hold good title and that if it is determined that lessors do not have good title to the entire 101.25 acres such facts shall not in any way impair the obligation of this agreement on the part of Lessee to purchase such portion of said land as may be held by Lessors under good title. In other words, Lessors are hereby obligated to lease, and Lessee to accept such lease, that portion of said tract that is determined in the manner above mentioned to be held under good title by Lessors.

If Lessee neither accepts nor rejects the title to the land described above, and covered by said lease, or to any portion thereof, as herein contemplated, within the time specified, then you are authorized to deliver the attached lease to the Lessors and the proceeds of the draft to the Lessee, whereupon the parties hereto will be relieved from all obligations hereunder. Provided, however, Lessee shall be obligated to take lease to all of said tract to which Lessors hold good title. You will please note your acceptance of this escrow agreement in the manner and at the place indicated below.

Witness the signatures of the parties this the 8th day of May, 1934.

/s/ C. H. Blount
/s/ Abbie J. Blount
Lessors.
Stanolind Oil and Gas Company,
By /s/ E. H. Stafford
Agent.
(Acknowledgments) Lessee.

The City National Bank of Houston, Texas, hereby acknowledges receipt of a copy of the foregoing escrow contract and of the lease and draft mentioned therein, and agrees to hold and dispose of same as escrow agent in accordance with the provisions of said contract this the 8th day of May, 1934.

The City National Bank
By H. L. Sadler, Cashier